UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

S. BAXTER JONES,                              Case No. 17-11744
    Plaintiff,

v.

CITY OF DETROIT ET AL.,                     HON. AVERN COHN
    Defendants.
_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 34) AND DISMISSING CERTAIN DEFENDANTS

**Table of Contents**

I. INTRODUCTION………………………………………………………………………………2

II. BACKGROUND……………………………………………………………………………...3

      A. THE ARREST…………………………………………………………………………4

      B. THE ARRESTING OFFICERS……………………………………………………….5

      C. THE POST-ARREST TRANSPORTATION………………………………………….6

      D. THE CITY OF DETROIT'S ADA PROCEDURES………………………………….7

III. LEGAL STANDARD………………………………………………………………………….7

IV. THE ADA……………………………………………………………………………………..8

     A. THE SCOPE OF THE ADA………………………………………………………….8

     B. THE ADA'S REMEDIAL SCHEME………………………………………………10

     C. MUNICIPAL LIABILITY UNDER THE ADA………………………………………12

     D. INDIVIDUAL LIABILITY UNDER §1983 FOR ADA VIOLATIONS…………………14

V. QUALIFIED IMMUNITY ……………………………………………………………………16

VI. MICHIGAN'S PERSONS WITH DISABILITIES CIVIL RIGHTS ACT……………………17

VII. FOURTH AMENDMENT – EXCESSIVE FORCE………………………………………18

VIII. CONCLUSION……………………………………………………………………………20

## I. INTRODUCTION

This case involves the Americans with Disabilities Act (ADA),[1] the Rehabilitation Act,[2] and 42 U.S.C. § 1983. Plaintiff, Baxter Jones ("Jones"), is a wheelchair-bound individual qualified for protections provided by the ADA and the Rehabilitation Act. Jones is suing the City of Detroit ("the City") and certain police officers[3] for disability discrimination and for the use of excessive force during his arrest. Jones says that his rights were violated while being transported to a detention center in an ill-equipped police van following a lawful arrest. Jones also says that the City is non-complaint with the ADA because it lacks adequate procedures related to ADA grievances. The amended complaint contains the following counts (Doc. 32):

    Count 1: ADA claims against the City based on the actions of its officers
    Count 2: ADA claims against individual police officers
    Count 3: Rehabilitation Act claims against the City
    Count 4: Rehabilitation Act claims against individual officers
    Count 5: Fourth Amendment Excessive Force claims against individual officers
    Count 6: Michigan's Persons with Disabilities Civil Rights Act claims against the City
    Count 7: ADA claims against the City based on its ADA procedures

In previous proceedings, the Court bifurcated Jones' claims for injunctive relief from his claims for damages because the parties say that the claims for injunctive relief are in the process of being resolved. (Doc. 51). Specifically, the parties are currently working together to resolve the issues relating to the police department's ADA procedures. (Doc. 53). Therefore, the Court will not address Count 7 at this time.

---

[1] 42 U.S.C. § 12132, *et seq.*
[2] Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.*
[3] The Detroit Police Department officers named in the complaint are Sergeant Reuben Fluker, Officer Robin Cleaver, Sergeant Edward Hudson, Commander Elvin Barren, Officer Gregory Robson, Capitan Kyra Hope, and John Doe.

The way in which Jones alleges his claims and theories of liability present issues of law that have not been squarely addressed by the Sixth Circuit and are the subject of reasonable dispute.[4] For instance, Jones' claims require the Court to interpret the language of Title II of the ADA, which in relevant part states "no qualified individual with a disability shall, by reason of such disability, be excluded from the participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Court must decide whether this statute (1) extends to police activities, and (2) permits an action against a municipality based on *respondeat superior* liability. Further, the Court must decide whether Jones' 42 U.S.C. § 1983 claim provides a remedy against individual officers for causing a deprivation of the federal rights provided by the ADA and the Rehabilitation Act.

Now before the Court is Defendants' motion for summary judgment. (Doc. 34). For the following reasons the motion is GRANTED in part, and DENIED in part.

## II.  BACKGROUND

Pursuant to the Court's motion practice guidelines, a motion for summary judgment is to be accompanied by a separate document that details the relevant facts, which are to be organized into numbered paragraphs. (Doc. 19, p. 4–11). Here, the parties' enumerated statement of facts are oversimplified and do not contain all the relevant facts that the parties discuss in their briefs. This makes it difficult for the Court to be certain that its recitation of the factual record accurately reflects the material facts

---

[4] Not all the issues discussed by the Court have been raised by the parties, however, the Court finds that it must decide these legal issues before it can address the substance of Jones' claims.

not in dispute. The Court's motion practice places an onus on the parties to consolidate all the relevant facts into one document. This helps reveal factual disputes. Because the parties failed to consolidate a full factual record, the Court sourced its understanding of the record from several documents filed by the parties. The facts, as best can be gleaned from the record, are as follows.

### *A. The Arrest*

A protest took place at the Homrich Contractor Facility on W. Grand Boulevard in Detroit, Michigan on July 18, 2014 regarding residential water shutoffs for nonpayment of water bills. (Doc. 48). Jones was a protester and participated in the obstruction of the entranceway of the Homrich Contractor Facility. (Doc. 48). Police officers were called to the scene and the protesters were ordered to move from the entranceway. (Doc. 48). When Jones refused to obey, he was arrested. (Doc. 48). Jones does not claim that his arrest was unlawful or improper. (Docs. 32, 48).

Jones was arrested with eight other individuals for disorderly conduct. (Docs. 40, 48). The eight other arrestees were transported to the detention center on a bus. (Docs. 34, 40). However, Jones could not be transported on the bus due to his wheelchair. (Docs. 34, 40). So, the police officers decided to transport Jones in a van. (Docs. 40, 48). Jones says that after he was loaded into the van he informed the police officers that his neck was in pain—which was caused by him having to duck his head due to the height of his wheelchair and the low ceiling in the van. (Doc. 40). The parties submitted a video and photo evidence of Jones being loaded into the van. (Docs. 34-8, 40-8, 40-17, 40-18).

## B. The Arresting Officers

The police officers named in the complaint are: (1) Sergeant Reuben Fluker, (2) Officer Robin Cleaver, (3) Sergeant Edward Hudson, (4) Commander Elvin Barren, (5) Officer Gregory Robson, (6) Capitan Kyra Hope, and (7) John Doe.

**1. Sergeant Reuben Fluker**

Jones says that Fluker is individually liable for failing to accommodate him during his post-arrest transportation. Jones says Fluker is liable because: (1) he did not ask Jones whether he had any specific transportation needs, (2) he was one of the police officers who lifted Jones' wheelchair into the van, and (3) he reached his hand between Jones' head and the doorframe to pushed Jones' head down so he could fit him into the van ("when, in fact, he did not fit"). (Docs. 32, 41).

**2. Officer Robin Cleaver**

Jones says that Cleaver is individually liable for failing to accommodate him during his post-arrest transportation. Jones says Cleaver was one of the police officers who participated in loading Jones into the van. Cleaver pulled the wheelchair from inside the back of the van as other police officers lifted Jones' wheelchair. (Docs. 32, 41).

**3. Sergeant Edward Hudson**

Jones says that Hudson is individually liable for failing to accommodate him during his post-arrest transportation. Hudson was one of the police officers who participated in loading Jones into the van. (Docs. 32, 41).

**4. Commander Elvin Barren**

Jones says that Barren is individually liable for failing to accommodate him during his post-arrest transportation. Jones says that Barren (1) made the decision to transport Jones in the van, (2) did not consider other transport options, as was

5

authorized by police policy, (3) participated in Jones' arrest, (4) did not ask Jones whether he had any specific transportation needs, and (5) instructed other police officers to lift Jones into the van. (Docs. 32, 41).

**5. Officer Gregory Robson**

Jones and the City have agreed that Robson should be dismissed from the case.

**6. Capitan Kyra Hope**

Jones and the City have agreed that Hope should be dismissed from the case.

**7. John Doe**

Jones and the City have agreed that "John Doe" should be dismissed from the case.

This leaves only Fluker, Cleaver, Hudson, and Barren as individual defendants.

### *C. The Post-Arrest Transportation*

Jones says that during transportation to the detention center he was not secured by a seatbelt, but instead was secured by "a DPD intern, [who] sat in the back of the van and placed a foot against a wheel of [Jones'] chair." (Doc. 40, p. 16). Jones says that while driving to the detention center his head struck the low ceiling in the van several times. (Doc. 40). Jones says that he notified the police officer driving the van that he was in pain. Id.[5]

After arriving at the detention center, Jones was released and was not prosecuted. (Docs. 40, 48). Jones says that he suffered medical damages resulting from the police officers' failure to accommodate him during transportation. (Docs. 32, 40, 48). Specifically, Jones attributes medical injuries to the aggravation of his pre-

---

[5] The officer driving the van was not identified during discovery. Jones makes no claims against this police officer.

6

existing neck injury, and says that his "slouched posture [in the van] impacted him more severely than it might have impacted another person . . . ." (Doc. 40, p. 15, n.8)[6].

### D. The City of Detroit's ADA Procedures

At the time of Jones' arrest, the police department had the following procedures in place:

> Any wheelchairs, crutches, and medication, shall be transported with, but not placed in the possession of the detainee. . . . In the event a cast, brace or prosthetic device must be removed for safety concerns (e.g. hook or possible weapon) EMS shall be used for the transport.
>
> In instances when a person has a disability that prevents transport in a marked patrol vehicle, a supervisor shall be requested for assistance to determine the most appropriate method of transportation. Alternate methods of transportation may include, but are not limited to, the use of an unmarked scout car, van, or EMS transport.

(Doc. 40-14).

After the incident, Jones "sought to file a complaint pursuant to 28 C.F.R. § 35.107." (Doc. 40, p. 17). However, Jones says that no ADA grievance procedures were in place from July 2014 through October 2014. (Doc. 32). He also says that "he filed a motion in the City of Detroit bankruptcy proceeding . . . seeking leave to object to the Plan of Adjustment because the Plan did not provide for accessibility in public safety." Id. Jones ultimately filed a complaint with the City's Human Rights Department, which the City says provides its ADA grievance procedure. (Docs. 34, 40, 48).

### III. LEGAL STANDARD

The summary judgment standard under Fed. R. Civ. P. 56 is well known and does not require a belabored discussion here. Ultimately, a district court will grant a

---

[6] See also (Doc. 34-5, p. 9):
    Q: Did you have spinal cord damage as a result of the [prior] auto accident?
    A: Yes.

7

summary judgment motion if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law; while drawing "all justifiable inferences in the light most favorable to the non-moving party," Hager v. Pike Cnty. Bd. of Ed., 286 F.3d 366, 370 (6th Cir. 2002).

## IV.   THE ADA

Title II of the ADA and Section 504 of the Rehabilitation Act are similar in purpose and scope. McPherson v. Michigan High School Atheletic Ass'n, Inc., 119 F.3d 453, 459 (6th Cir. 1997). Typically, these claims are analyzed together "because the standards under both acts are largely the same [and] cases construing one statute are instructive in construing the other." Id. at 460 (quoting Andrews v. State of Ohio, 104 F.3d 803, 807 (6th Cir. 1997)). "[T]he principal distinction between the two statutes is that the coverage under the Rehabilitation Act is limited to entities receiving federal financial assistance." Id. "There may be other differences in the application of the two statutes," however, those differences are not implicated here. Id. Thus, for simplicity's sake, the analysis that follows will focus on the ADA and omit repetitious references to the Rehabilitation Act.

### *A. The Scope of the ADA*

In relevant part, Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from the participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Jones says that this language imposes a duty to accommodate disabled individuals during post-arrest police transportations. However, the Sixth Circuit has never held that the ADA applies in the

8

context of police arrests,[7] and there is conflicting precedent on the issue. *Compare* Patrice v. Murphy, 43 F.Supp.2d 1156, 1160 (W.D. Wash. 1999) (stating "an arrest is not the type of service, program or activity from which a disabled person could be excluded or denied [] benefits"); Rosen v. Montgomery County Maryland, 121 F.3d 154, 157–158 (4th Cir. 1997) (stating "[t]he most obvious problem is fitting an arrest into the ADA at all . . . calling a[n] [] arrest a 'program or activity' of the County . . . strikes us as a stretch of the statutory language and the underlying legislative intent") *with* Gorman v. Bartch, 152 F.3d 907 (8th Cir. 1998) (holding the ADA extends to post-arrest transportations); Hainze v. Richards, 207 F.3d 795, 802 (5th Cir. 2000) (holding that police officers are "under a duty to reasonably accommodate [plaintiff's] disability in handling and transporting him").

    The Court finds Gorman v. Bartch persuasive precedent because the Eighth Circuit was faced with a similar case in which a wheel-chair bound individual claimed to be injured during his post-arrest transportation because the police officers failed to provide him with an accommodation. In Gorman, the wheelchair-bound plaintiff was arrested for trespassing. Id., at 909. After his arrest, the police transported him in "a patrol wagon that was not equipped with a wheelchair lift or wheelchair restraints." Id. The plaintiff objected to the use of the van, stating that it was "not properly equipped for him to ride in." Id. During the drive to the police station, the plaintiff sustained injuries because he was not properly secured within the van. Id. at 909–910. After analyzing the ADA's statutory language and legislative history, the Eighth Circuit concluded that

---

[7] See Roell v. Hamilton County, OH, 870 F.3d 471, 489 (2017) ("[w]e need not decide whether Title II applies in the context of arrests").

9

the ADA covers post-arrest transportations. Id. at 911–914. The court reasoned that the ADA "must be interpreted broadly to include the ordinary operations of a public entity in order to carry out the purpose of prohibiting discrimination." Id. at 913. "The 'benefit' [plaintiff] sought in this case was to be handled and transported in a safe and appropriate manner consistent with his disability." Id. Because the facts of this case closely resemble the facts in Gorman, and the Eighth Circuit's reasoning is persuasive, the Court finds that the ADA imposes a duty to accommodate disabled individuals during their post-arrest transportation.[8] This holding, however, does carry the day for Jones. Issues remain regarding the manner in which the ADA imposes this "duty to accommodate" on municipalities and individual officers.

### B. The ADA's Remedial Scheme

Before discussing whether Jones can recover under his theory of *respondeat superior* liability against the City, or whether he can sue the individual police officers under §1983 for ADA violations, it is important to understand the interrelationships between the ADA, the Rehabilitation Act, Title VI of the Civil Rights Act of 1964 ("Title VI"),[9] and Title IX of the Education Amendments of 1972 ("Title IX").[10] It is necessary to first established the relevancy of Title IX precedent to an ADA analysis because the Court later utilizes Title IX precedent to resolve the questions of law necessarily raised by Jones' claims.

---

[8] This holding is narrow and should not be construed as deciding that the ADA extends to arrests generally. That issue is not before the Court. The Court only finds that post-arrest transportation is properly within the scope of the ADA.
[9] 42 U.S.C. § 2000d.
[10] 20 U.S.C. § 1681(a).

In relevant part, Title II of the ADA provides that "[t]he remedies, procedures, and rights set forth in [the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title." Id. at § 12133. Thus, the ADA expressly adopts the remedies available under the Rehabilitation Act. In turn, the Rehabilitation Act incorporates "[t]he remedies, procedures, and rights set forth in Title VI of the Civil Rights Act of 1964." 29 U.S.C. § 794a(2).

However, Title VI "mentions no remedies—indeed, it fails to mention even a private right of action." Barnes v. Gorman, 536 U.S. 181, 187 (2002). Instead, Title VI has implied a private cause of action and remedies. See, e.g., Gebser, 524 U.S. at 284. Thus, a district court must look at Title VI precedent to determine the available remedies (and by extension, the remedies available under the Rehabilitation Act and the ADA).

The relevance of Title IX is that "[t]he statute was modeled after Title VI." Id. at 286. Consequently, "[t]he two statutes operate in the same manner . . . ." Id. When interpreting Title IX, the Supreme Court has frequently looked at Title VI to guide its interpretation, and vice versa. See, e.g., Id. at 280–290; Barnes v. Gorman, 536 U.S. at 185–187. It follows, then, that remedies available under Title IX are the same as Title VI, which are incorporated by the Rehabilitation Act and the ADA.

Thus, when analyzing the ADA's remedial scheme, the law operates like a matryoshka doll.[11] To determine whether a particular remedy is available under the ADA, the Court looks at its remedial scheme, which looks to the Rehabilitation Act,

---

[11] A matryoshka doll is a Russian nesting doll that separates to reveal a smaller figure of the same sort inside, which has, in turn, another figure inside it, and so on.

11

which looks to Title VI, which looks *like* Title IX.  Consequently, precedent interpreting the remedies available under Title VI or Title IX must be considered when analyzing the ADA's remedial scheme.  Supreme Court decisions interpreting the remedies available under Title IX have a domino effect that reverberate through Title VI, the Rehabilitation Act, and finally the ADA.[12]

**Fig.1** – Civil Rights Legislation:



### C. Municipal Liability under the ADA

The Supreme Court has not decided the issue of whether Title II of the ADA authorizes a claim against a municipality based on *respondeat superior* liability.  In City & County of San Francisco, Calif. v. Sheehan, 135 S. Ct. 1765 (2015), the Supreme Court expressly recognized this issue remains an open question, stating:

> Our decision not to decide whether the ADA applies to arrests is reinforced by the parties' failure to address a related question: whether a public entity can be held liable for damages under Title II for an arrest made by its police officers.  Only public entities are subject to Title II, and the parties agree that such an entity can be held vicariously liable for money damages for the purposeful or deliberately indifferent conduct of its employees. But we have never decided whether that is correct, and we

---

[12] The decision to apply Title IX case law to the ADA is not unprecedented. See, e.g., Stahura-Uhl v. Iroquois Cent. School Dist., 836 F.Supp.2d 132, 145 (W.D.N.Y. 2011); Liese Indian River Cty. Hosp. Dist., 701 F.3d 334, 348–49 (11th Cir. 2012).

decline to do so here, in the absence of adversarial briefing.
Id. at 1773–74 (internal citations omitted).

Further, the issue of *respondeat superior* liability has not been addressed by the Sixth Circuit and there exists conflicting authority amongst other circuits. *Compare* Duvall v. County of Kitsap, 260 F.3d 1124, 1141 (9th Cir. 2011) (stating that under Title II a "public entity is liable for the vicariously acts of its employees") *with* Liese Indian River Cty. Hosp. Dist., 701 F.3d 334, 348–49 (11th Cir. 2012) (stating there is no *respondeat superior* liability under the Rehabilitation Act in light of the Gebster decision); see also Gray v. Cummings, 917 F.3d 1, 17 (2019) ("whether a public entity can be vicariously liable for money damages under Title II of the ADA" remains "an open question"); Rosen v. Montgomery Cunty Maryland, 121 F.3d 154, 156 n.2 (4th Cir. 1997).  This uncertainty amongst circuits has been caused by the Supreme Court's decision in Gebser v. Lago Vista Independent School Dist., 524 U.S. 274 (1998).

In Gebser, the Supreme Court held that Title IX does not permit recovery on a theory of *respondeat superior* liability. Id. at 288.  The Supreme Court stated, "Title IX contains important clues that Congress did not intend to allow recovery in damages where liability rests solely on principles of vicarious liability." Id.  There is nothing in Gebster that calls into question its applicability to Title VI.  On the contrary, the Supreme Court's back-and-forth contrast between Title IX and Title VI compels a finding that Title VI would similarly bar liability based on *respondeat superior* liability.

Thus, the Supreme Court's decision to prohibit *respondeat superior* liability under Title IX extends to Title VI, which in turn extends to the Rehabilitation Act and

13

the ADA because those statutes incorporate the remedies of Title VI by reference.[13] Accordingly, a claim brought under Title II of the ADA for *respondeat superior* liability must fail for the same reasons it must fail under Title IX.[14]

Here, Jones does not take issue with a municipal policy, practice, or custom. Instead, Jones seeks to hold the City liable under the ADA for its police officer's failure to reasonably accommodate him during his post-arrest transport. (Doc. 32, p.11) ("[p]laintiff was excluded from participation in or was denied the benefits of the services, programs, or activities of a public entity, specifically by [the] City of Detroit's Police Department through its employees and officers . . . <u>for whom [the] City is vicariously liable</u>"). Because the ADA does not permit suit against a municipality based on *respondeat superior* liability, Count 1 of the complaint fails to survive summary judgment; and Jones' claims under the Rehabilitation Act (Count 3) must fail for the same reasons.

### *D. Individual Liability under 42 U.S.C. § 1983 for ADA Violations*

Jones has sued the police officers in their individual capacity, under §1983, claiming that they violated his federal ADA rights.

---

[13] This holding is consistent with the Eleventh Circuit's decision in <u>Liese</u>, 701 F.3d at 348–49.

[14] This conclusion necessitates the dismissal of Jones' claims against the City for the activities surrounding his arrests. Therefore, it unnecessary to address the City's argument that Jones was not entitled to an ADA accommodation because he failed to "request" an accommodation. The ADA's "request" requirement is found in Title I, and it is uncertain whether this "request" requirement applies to Title II. <u>See, e.g.</u>, David A. Maas, <u>Expecting the Unreasonable: Why a Specific Request Requirement For ADA Title II Discrimination Claims Fails to Protect Those Who Cannot Request Reasonable Accommodations</u>, 5 HARV. L. & POL'Y REV. 217, 220–223 (2011).

Claims brought pursuant to 42 U.S.C. § 1983 rely upon substantive rights that are not provided for within the statute itself. In relevant part, §1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Thus, §1983 is not "a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in [] federal statutes." Stahura-Uhl v. Iroquois Cent. School Dist., 836 F.Supp.2d 132, 145 (W.D.N.Y. 2011) (citing Graham v. Connor, 490 U.S. 386, 393–94 (1989)). However, "§1983 does not provide an avenue for relief every time a state actor violates a federal law." City of Rancho Palos Verdes, Calif. v. Abrams, 544 U.S. 113, 119 (2005). A plaintiff seeking redress under §1983 "must demonstrate that the federal statute creates an individually enforceable right in the class of beneficiaries to which he belongs." Id. at 120. "The critical question [] is whether Congress meant the judicial remedy expressly authorized by [the statute] to coexist with an alternative remedy available in a §1983 action." Id.

"The provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983." Id. at 121. "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." Id. Therefore, to determine whether Congress intended that the remedies in §1983 coexist with the remedies in the ADA, the ADA's enforcement provisions must be analyzed.

As detailed above, Title IX precedent must be considered when deciding the remedies available under the ADA. Specifically, Fitzgerald v. Barnstable School

15

Committee, 555 U.S. 246 (2009), is controlling. In <u>Fitzgerald</u>, the Supreme Court held that Title IX's remedial scheme compelled the conclusion that litigants could also seek redress under the remedies available pursuant to §1983. Thus, Title IX's remedial scheme was not sufficiently comprehensive to preclude the use of §1983. Because Title IX's remedial scheme mirrors the remedial scheme of Title VI, which provides the remedies under the ADA, it follows that the ADA's remedial scheme is likewise not sufficiently comprehensive to preclude the use of §1983.

The Court is not alone in finding that §1983 provides a remedy against individual officers for ADA violations. In <u>Stahura-Uhl v. Iroquois Cent. School Dist.</u>, 836 F.Supp.2d 132 (W.D.N.Y. 2011), the court recognized the significance of the <u>Fitzgerald</u> decision and held that "because the remedial scheme under Title IX and Title VI are nearly identical and because the Supreme Court has instructed that a Title IX claim can be vindicated under §1983, this Court has no trouble concluding that the same analysis applies to Title VI, and by extension the Rehabilitation Act." <u>Stahura-Uhl</u>, 836 F.Supp.2d at 146.

Accordingly, Jones has stated a cognizable legal claim against the individual police officers because §1983 authorizes an "individual capacity" claim for violations of Title II of the ADA.

### V. QUALIFIED IMMUNITY

"A plaintiff's claims brought under § 1983 requires proof that: (1) the defendant was a person acting under the color of state law, and (2) the defendant deprived the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States." <u>Fridley v. Horrighs</u>, 291 F.3d 867, 871–872 (6th Cir. 2002). "Moreover, the [] right must be 'clearly established' at the time of the violation so that 'it would be

16

clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Rayfield v. City of Grand Rapids, No. 18-1927, 2019 WL 1601770 at *6 (6th Cir. April 15, 2019) (quoting Klein v. Long, 275 F.3d 544, 550 (6th Cir. 2001)). Thus, the police officers cannot be held liable unless the "contours of a right" are "sufficiently clear" and every reasonable official would have understood that what he or she was doing violates that right. Anderson v. Creighton, 483 U.S. 635, 640 (1987).

Here, Jones seeks to hold the police officers individually liable under § 1983. Although the Court has concluded that § 1983 authorizes individual liability for police officers violating ADA rights—the police officers are entitled to qualified immunity because the law was not clearly established at the time.

As illustrated by the discussion above, the right to be accommodated during a post-arrest transportation is not a clearly established right. Even more unprecedented is the duty that the ADA imposes on *individual* police officers. Not only is there no guiding precedent in the Sixth Circuit, there are conflicting opinions amongst other circuits. Gray, 917 F.3d at 17; Duvall, 260 F.3d at 1141; Liese, 701 F.3d at 348–49; Rosen, 121 F.3d at 156 n.2. It cannot be said that the rights conferred by the ADA, and the duties it imposes on police officers, were sufficiently clear at the time of Jones' arrest. Thus, the police officers are entitled to qualified immunity for Counts 2 and 4.

## VI. MICHIGAN'S PERSONS WITH DISABILITIES CIVIL RIGHTS ACT

The ADA and Rehabilitation Act claims against the City are barred because the federal statutes confer a cause of action that does not abrogated sovereign immunity for claims based on vicarious liability. This holding does not apply to Jones' state law claim because the state is free to abrogate its sovereign immunity at will.

There is very little case law that extends Michigan's PWDCRA to municipal activities beyond employment or housing situations. Although PWDCRA claims are frequently analyzed alongside ADA claims, there are differences here that render a parallel interpretation inappropriate.

A federal court should not interpret a state statute when the interpretation could lead to its unprecedented expansion. Because it is within the discretion of the Court to dismiss related state law claims when "the claim raises a novel or complex issue of State law," the Court declines to exercise supplemental jurisdiction over the state law claim. 28 U.S.C. § 1367(c)(1).

## VII. FOURTH AMENDMENT – EXCESSIVE FORCE

While the issue of excessive force is present in the parties' papers, the matter has not received enough focus (at oral arguments or within the briefs) for the Court to make a summary judgment determination at this time. For the benefit of the parties, the discussion below details the clearly established law within the Sixth Circuit, which should be the focus of any future discussions regarding excessive force.

Under the Fourth Amendment, police officers may not use excessive force to effectuate an arrest. Smoak v. Hall, 460 F.3d 768, 783 (6th Cir. 2006) (citing St. John v. Hickey, 411 F.3d 762, 771 (6th Cir. 2005)). "Courts must determine whether a particular use of force is reasonable based on 'the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Id. (citing Graham v. Connor, 490 U.S. 386 (1989)). "The assessment is fact-specific, based on a totality of the circumstances." Baynes v. Cleland, 799 F.3d 600, 608 (6th Cir. 2015)

In the Sixth Circuit, an arrestee who is suffering from an ailment that is not readily apparent to police officers must voice a complaint of the injury. See, e.g., Baynes, 799

18

F.3d at 607 (holding that a plaintiff must complain that handcuffs are too tight before a police officer can be subject to an excessive force violation). Further, "what would ordinarily be considered reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which would have been unknown to a reasonable officer at the time." Windham v. Harris, Texas, 875 F.3d 229, 242 (5th Cir. 2017) (quoting Rodriguez v. Farrell, 280 F.3d 1341, 1353 (11th Cir. 2002)). A detainee must go beyond merely voicing discomfort to put an officer on notice that the force being applied may be excessive. See Standifer v. Lacon, 587 Fed.Appx. 919, 923 (6th Cir. 2014) (plaintiff "did not communicate that she was in any pain besides saying a generic 'ow'—a consistent response *any time* handcuffs are placed on one's wrists."). Finally, Jones must have complained to the police officers in a way that would have put the officers on notice that he was being subjected to force that was aggravating his pre-existing condition.

Jones admits that his "slouched posture impacted him more severely than it might have impacted another person due to his prior neck injury . . . ." (Doc. 40, p. 15, n.8). It appears from the video evidence of Jones' post-arrest transportation that a person without a prior neck injury would not have suffered an exercise of excessive force. Thus, Jones must establish that he voiced a complaint to the police officers that he was in more pain than someone of ordinary sensibilities. See, e.g., Standifer v. Lacon, 587 Fed.Appx. 919, 923 (6th Cir. 2014) (plaintiff "did not communicate that she was in any pain besides saying a generic 'ow'—a consistent response *any time* handcuffs are placed on one's wrists."). Neither party has focused on this inquiry, which makes it inappropriate to decide summary judgment at this time.

## VIII. CONCLUSION

For the reasons stated above, Defendants motion for summary judgment (Doc. 34) is GRANTED as to Counts 1, 2, 3, and 4, and DENIED, without prejudice, as to Counts 5 and 7.  The Court declines to exercise supplemental jurisdiction over Count 6, and it is DISMISSED. Lastly, Defendants Gregory Robson, Kyra Hope, and John Doe are DISMISSED from the case.

SO ORDERED.

                                                            s/Avern Cohn  
                                                         AVERN COHN  
                                                         UNITED STATES DISTRICT JUDGE

Dated:  6/4/2019  
Detroit, Michigan